IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| AVIS RENT A CAR SYSTEM, LLC, et al., | : | |
| | | Case No. 3:12-cv-399 |
| Plaintiffs, | : | |
| v. | | |
| | : | JUDGE WALTER H. RICE |
| CITY OF DAYTON, OHIO, | : | |
| Defendant. | | |

| | | |
|---|---|---|
| ENTERPRISE RENT A CAR COMPANY OF CINCINNATI, LLC dba ENTERPRISE RENT-A-CAR, et al., | : | |
| | | Case No. 3:12-cv-405 |
| Plaintiffs, | : | |
| v. | | |
| | : | JUDGE WALTER H. RICE |
| CITY OF DAYTON, OHIO, | : | |
| Defendant. | | |

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY
JUDGMENT (DOC. #37 IN 3:12-CV-399) OF PLAINTIFFS AVIS RENT
A CAR SYSTEM, LLC AND BUDGET RENT A CAR SYSTEM, INC.;
SUSTAINING MOTION FOR PARTIAL SUMMARY JUDGMENT ON
COUNT ONE OF THE AMENDED COMPLAINT (DOC. #38 IN 3:12-CV-
405) OF PLAINTIFFS ENTERPRISE RAC COMPANY OF CINCINNATI,
LLC DBA ENTERPRISE RENT-A-CAR AND VANGUARD CAR RENTAL
USA, LLC DBA NATIONAL AND ALAMO; OVERRULING CROSS-
MOTIONS FOR SUMMARY JUDGMENT (DOC. #58 IN 3:12-CV-399 &
DOC. #40 IN 3:12-CV-405) OF DEFENDANT CITY OF DAYTON,
OHIO; OVERRULING DEFENDANT'S MOTION FOR ORAL ARGUMENT
(DOC. #41 IN 3:12-CV-405), AS ORAL ARGUMENT NOT DEEMED
NECESSARY; VACATING THE COURT'S JULY 1, 2013, ORDER
SUSTAINING DEFENDANT'S MOTION FOR ORAL ARGUMENT (DOC

#59 IN 3:12-CV-399); OVERRULING, WITHOUT PREJUDICE,
DEFENDANT'S MOTION IN LIMINE TO EXCLUDE PAROL EVIDENCE
(DOC. #62 IN 3:12-CV-399 & DOC. #45 IN 3:12-CV-405)

Pending before the Court are cross-motions for summary judgment filed by all parties in the related cases of *Avis Rent A Car System, LLC, et al. v. City of Dayton, Ohio*, Case No. 3:12-cv-399 ("Avis Case") and *Enterprise RAC Company of Cincinnati, LLC dba Enterprise Rent-A-Car et al., v. City of Dayton*, Case No. 3:12-cv-405 ("Enterprise Case").[1]  Avis Rent A Car System, LLC ("Avis") and Budget Rent A Car System, Inc. ("Budget") (collectively, the "Avis Plaintiffs"), and Enterprise RAC Company of Cincinnati, LLC dba Enterprise Rent-A-Car ("Enterprise") and Vanguard Car Rental USA, LLC dba National and Alamo ("Vanguard") (collectively, the "Enterprise Plaintiffs") filed suit against the City of Dayton, Ohio ("City," "Defendant").  In their complaints, Plaintiffs allege that the City breached "the "Rental Car Ready/Return Agreement" ("Ready/Return Agreement"), a contractual lease agreement that governed their rental car operations at the Dayton International Airport ("Airport"), by prematurely terminating the agreement and announcing an intent to replace it with a permit process.  The Court's jurisdiction is based on the parties' diverse citizenship and the amount in controversy.  28 U.S.C. § 1332.

---

[1] Citations will be made to the records of both related cases, with "Avis Case" and "Enterprise Case" signifying the respective case numbers.  Thus, the citation "Avis Case at Doc. #1" will refer to Document #1 on the docket of Case No. 3:12-cv-399.

All Plaintiffs initially filed a motion for temporary restraining order. Avis Case at Doc. #3; Enterprise Case at Doc. #5. The Plaintiffs agreed to consolidate their motions for preliminary injunction with trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2). Avis Case at Doc. #33; Enterprise Case at Doc. #33. After an accelerated period of discovery, the Avis Plaintiffs filed a Motion for Summary Judgment on June 4, 2013. Avis Case at Doc. #37. On June 18, 2013, the Enterprise Plaintiffs filed a Motion for Partial Summary Judgment on Count One of the Amended Complaint.[2] Enterprise Case at Doc. 38. On June 28, 2013, the City filed a Cross-Motion for Summary Judgment on All of Plaintiffs' Claims in both cases. Avis Case at Doc. #58; Enterprise Case at Doc. #40. For the reasons set forth below, the Court SUSTAINS Plaintiffs' Motions for Summary Judgment and OVERRULES the City's Cross-Motions for Summary Judgment.

---

[2] Before filing for summary judgment, the Enterprise Plaintiffs filed an Amended Complaint (Enterprise Case at Doc. #37) on June 10, 2013, adding a claim for attorneys' fees based on alleged bad faith conduct by the City. The Enterprise Plaintiffs seek summary judgment only on their breach of contract/breach of lease agreement claim, and reserve the issue of bad faith for trial. Hence, the Enterprise Plaintiffs' motion is captioned a "Motion for Partial Summary Judgment on Count One of the Amended Complaint." Enterprise Case at Doc. #38. The Avis Plaintiffs also filed an Amended Complaint (Avis Case at Doc. #65), adding a claim for attorneys' fees based on alleged bad faith conduct by the City. However, they also seek summary judgment only on the breach of contract/breach of lease agreement claim. The Avis Plaintiffs' Motion for Summary Judgment was filed before their Amended Complaint, and is not, therefore, captioned a "Motion for Partial Summary Judgment." Avis Case at Doc. #37. For the sake of simplicity, the Court will refer to each pending motion as a Motion for Summary Judgment.

## I.    BACKGROUND

Plaintiffs are rent-a-car agencies ("RACs") that have operated out of the Dayton International Airport, pursuant to a series of lease agreements.  While none of the documents in question were specifically titled "lease agreement," all of the agreements governed the terms and conditions of the RACs' operations at the Airport, including the occupancy of office space and parking spaces for rental vehicles.  The lease agreement alleged to be breached, and, therefore, the subject of the parties' breach of contract/breach of lease agreement claims, is the most recent agreement, the "Rental Car Ready/Return Agreement" ("Ready/Return Agreement").  At issue is whether the provisions of the Ready/Return Agreement bind the City to a twenty year lease period, as the Plaintiffs claim, or, as the City argues, said agreement expired on December 31, 2012.  The parties agree that only the language of Ready/Return Agreement is relevant to resolve the controversy, and that there are no disputed issues of fact.  However, in order to provide a context for its analysis, the Court will first provide an overview of the all agreements that the parties have entered into and the events leading up to the Plaintiffs' filing of their lawsuits.

### A.    The Concession Agreement

On December 13, 2006, all of the RACs entered into the first of several agreements with the City, each of which was titled a "Non-Exclusive Rental Car

4

Concession and Lease Agreement" (hereinafter, "Concession Agreement").[3]  Each

RAC signed its own Concession Agreement with the City.  Although they differed

slightly with regards to the amount of office or counter space or number of parking

spaces allotted to each RAC, the Concession Agreements were identical in all

material respects.[4]  Thus, for the sake of simplicity, citations to the Concession

Agreement will refer only to the agreement between the City and Avis.  Avis Case

at Doc. #58-6.

The Concession Agreement governed the terms and conditions for each

RAC's lease of on-airport premises, and contained a choice of law provision

requiring the agreement to be governed by and construed in accordance with Ohio

law.  *Id.* at 2, 31.  The premises leased to each RAC included 1) a "Counter/Office

Area" in the baggage claim area of the airport; 2) a "Customer Queuing Area" in

front of the Counter/Office area; and 3) a number of "Ready/Return parking

spaces" for the exclusive use of each RAC.  *Id.* at 6.  "Ready/Return" refers to an

area of parking spaces at the airport where the RACs' customers could pick up and

return rented vehicles, and where the RACs could store unrented vehicles.  *Id.* at

5.  At the time the parties entered into the Concession Agreement, the

---

[3] *See* Avis Case at Doc. #58-6 (Avis Concession Agreement) and Doc. #58-7
(Budget Concession Agreement); Enterprise Case at #40-8 (Enterprise Concession
Agreement) and Doc. #40-9 (Vanguard Concession Agreement).

[4] For example, the Avis Concession Agreement gave Avis 320 square feet of office
space, while the Enterprise Concession Agreement gave Enterprise 323 square feet
of such.  *Compare* Avis Case at Doc. #58-6 (Avis Concession Agreement) *with*
Enterprise Case at #40-8 (Enterprise Concession Agreement).

Ready/Return parking spaces were located on a surface lot at the airport.

Enterprise Case at Doc. #37 ¶ 34 and Doc. #39 ¶ 34.

The Concession Agreement contemplated an effective term of three years,

beginning on January 1, 2007, and expiring on December 31, 2009. Avis Case at

Doc. #58-6. Article III, Subsection B of the Concession Agreement provided for a

maximum of three renewal periods of one year each, and required the parties to

reduce their intent to renew to writing. *Id.* at 5. In addition, the Concession

Agreement contained a holdover clause stating that any post-term holding over or

possession of the premises "shall only constitute a month-to-month license on the

same terms and conditions specified in this Agreement, except that it may be

terminated at any time by the City" or the RACs.[5] *Id.* As explained below, the

parties later amended this provision of the Concession Agreement.[6] Article XIII

and Article XIV listed a series of specific events that would trigger their respective

right to terminate the Concession Agreement. Doc. #58-6 at 24-27; *See also infra*

Part III, at page 26.

The Concession Agreement generated revenue for the City from the RACs'

operations in a number of ways. The RACs paid rent for their counter and office

_____

[5] The City denies the Enterprise Plaintiffs' allegation that this provision actually
allowed the Plaintiffs to "hold over" on a month-to-month license under the same
terms and conditions specified in the Concession Agreements" after December 13,
2006. Am. Compl., Doc. #37 ¶ 36; Answer, Doc. #39 ¶ 36 of the Enterprise
Case. For its present purposes above, the Court is merely describing and quoting
the contents of the provision, rather than determining the merits of the parties'
contentions regarding this issue.

[6] *See infra* Part III, at page 26.

6

space at the rate of $50 a square foot. Doc. #58-6 at 15. An annual fee, the greater of either 1) 10% of a RAC's monthly gross revenue or 2) the Minimum Annual Guarantee ("MAG"), a predetermined amount that the RAC guaranteed in order to secure the terms of the Concession Agreement, was paid in monthly installments. *Id*. The RACs also collected a "Customer Facility Charge" ("CFC") on behalf of the City. *Id*. at 17-18. The RACs have generated over $5 million in combined revenue paid to the City over the last twelve months. Doc. #37 ¶ 38; Doc. #39 ¶ 38.

On February 1, 2008, the parties executed a "First Amendment" to the Concession Agreement, which contained a modification to the Concession Agreement's definition of "Gross Revenues" in anticipation of a possible "carbon offset" program the RACs might offer to their customers. Avis Case at Doc. #58-6 at 36.

**B.    The Memorandum of Understanding – May 2, 2008**

On May 2, 2008, a "Memorandum of Understanding (Parking Structure at the Dayton International Airport)" ("MOU") was signed by corporate representatives of all Plaintiffs and a representative of the City Manager on behalf of the City.[7] Enterprise Case at Doc. #37-4. In addition, a representative of the

---

[7] Simon Ellis, a Vice President of the Hertz Corporation, also executed the MOU on behalf of Hertz. Enterprise Case at Doc. #37- 4 at 5. The Hertz Corporation is not a Plaintiff in either of the two cases before the Court.

City Attorney signed the MOU acknowledging that it was "approved as to form." *Id.* at 4.

The MOU memorialized 1) the City's intent to build a three-story parking garage at the airport, 2) the parties' agreement "that it is necessary and beneficial to relocate the [Ready/Return area] . . . to the ground floor of the Garage," because of a December 31, 2010, deadline for the relocation required by the Federal Aviation Administration due to a new air traffic control tower, and 3) the "use of CFC revenues for the design, construction, and operation of the Garage at the Airport." *Id.* at 1. According to the MOU, the entire first floor of the garage would contain approximately 700 parking spaces. *Id.* at 2. The first floor was to be entirely allocated to the RACs for their Ready/Return area and parking. *Id*. Public parking spaces would occupy the top two floors of the garage. *Id.*

The MOU described the estimated cost of the garage ($40.7 million), the percentage of the cost attributable to the RAC's first floor Ready/Return area, and several "commitments" made by the parties. *Id.* For example, the MOU stated that the "City commits that, upon construction of the Garage and the RAC's relocation to the Garage," the RACs would no longer be charged a rental fee per parking space, as long as each "RAC continues to collect and remit the necessary CFCs as required by City ordinance." *Id*. For the RACs, as soon as the City notified them that the spaces were available, the 700 spaces were to be "allocated among the RACs in accordance with the terms of the current Concession

8

Agreement or any successor agreement thereto." *Id.* The RACs also agreed to coordinate all relocation efforts after the completion of the Garage. *Id.*

In Section 4, "Financial Commitments," the MOU stated that the "City and each RAC will enter into a lease agreement for the ground level of the garage with a term of twenty years, during which time the RACs will not owe any space rent or ground rent for the use of the ground floor of the garage." *Id.* at 3. The MOU also stated that the intention of the agreement was to clarify the parties' roles, and that their participation in the MOU was "discretionary" and subject to termination at any time upon written notice to the other parties. *Id.* Furthermore, the MOU stated that it did "not replace any other agreement, understanding, or representation between the parties." *Id.* It also stated that "[t]he parties agree to negotiate, in good faith, such additional agreements and amendments as are necessary for the Garage project, including, but not limited to, amendment(s) to the Concession Agreement." *Id.*

## C. The Ready/Return Agreement

On March 4, 2009, in anticipation of the construction of the parking garage, the City entered into a new lease agreement, the "Rental Car Ready/Return Agreement" ("Ready/Return Agreement") with each of the Plaintiffs.[8] The

---

[8] *See* Avis Case at Doc. #58-1 (Avis Ready/Return Agreement) and Doc. #58-2 (Budget Ready/Return Agreement); Enterprise Case at #40-3 (Enterprise Ready/Return Agreement) and Doc. #40-4 (Vanguard Ready/Return Agreement). As with the Concession Agreement, citations to the Ready/Return Agreement will only refer to the Ready/Return Agreement between the City and Avis. Avis Case at Doc. #58-1.

9

Ready/Return Agreement recognized that the MOU had "set forth the parties'
commitments and understandings regarding the construction of [the Airport]
Parking Garage" and the operation of the RACs pursuant to the Concession
Agreement.[9] Avis Case at Doc. #58-1 at 2. The purpose of the Ready/Return
Agreement was "to set forth the terms and conditions for [each RAC's] lease and
use of the ground level of the Parking Garage as a Ready/Return," stating that the
new agreement "set forth the terms and conditions for the lease of space in the
Parking Garage, including the use of [the CFCs] for the design, construction and
operation of the Garage at the Airport." Id.

The agreement further stated that "[i]t is agreed that the ground floor of the
Parking Garage, containing approximately 193,020 ± square feet (approximately
700 ± parking spaces), shall be allocated to the RACs for Ready/Return," while
reserving the second and third floors for public parking. Id. at 4. Article V of the
Ready/Return Agreement, which described its "Term," stated:

> **This Agreement is effective from the date of complete execution by
> the parties. This Agreement shall expire twenty (20) years from the
> Garage Completion Date, unless earlier terminated as set forth in
> Article XI or Article XII. In addition, this Agreement shall
> automatically terminate upon the date of termination of the
> Concession Agreement.**

Article XI, "Termination by City," provided a list of twelve specific "Events
of Default" that would allow the City to voluntarily terminate the Ready/Return

---

[9] The above quoted provision asserted that the MOU was "defined in Article I," but
the set of defined terms in that article does not list the MOU. See Avis Case, Doc.
#58-1 at 2-3.

Agreement. *Id.* at 16-17. Examples included a RAC's failure to perform under the Ready/Return Agreement, discontinuation or abandonment of its airport operations, a lack of required insurance, or insolvency. *Id.* Similarly, Article XII, "Termination by Operator," listed specific conditions that triggered a RAC's right to terminate the Ready/Return Agreement, such as a court injunction or a governmental restriction on the Airport's operation. *Id.* at 17-18.

### D.    Subsequent Amendments to the Concession Agreement

On May 1, 2009, the City and Plaintiffs executed a second amendment to the Concession Agreement ("Second Amendment"), in order to "extend the term of the Agreement for an additional (3) years." Avis Case, Doc. #58-6 at 38. To accomplish this extension, the Second Amendment deleted Subsection A of Article III, the original provision describing the effective period of the agreement, and replaced it with a new provision specifying an expiration date of December 31, 2012. *Id.* The Second Amendment also deleted the provision regarding the one year renewal periods, but retained the holdover clause of the original agreement. *Id.*

Construction of the Airport's new garage was completed on August 1, 2010. Enterprise Case at Doc. #37 ¶ 67 and Doc. #39 ¶ 67. On November 23, 2010, the parties amended the Concession Agreement for a third time ("Third Amendment"). Avis Case, Doc. #58-6 at 41. The Third Amendment referenced the Ready/Return Agreement that the parties had entered into on March 24, 2009,

11

and it amended the Concession Agreement in two ways.  *Id.*  First, the Third Amendment replaced and updated the layout of the first floor of the garage contained in Exhibit C of the Concession Agreement.  Second, it stated that "all references to 'Ready/Return' throughout the [Concession] Agreement shall be superseded by the terms and conditions of the Ready/Return Agreement."  *Id.* Other than the foregoing changes, the Third Amendment stated that "all other terms and conditions of the [Concession] Agreement shall remain in full force and effect, and shall remain unchanged."  *Id.*

E.      **The Permit Process**

Sometime during 2012, the City's Director of Aviation, Terry Slaybaugh, asked the City's legal counsel "to look for ways for [the City] to be able to get out of" the Ready/Return Agreement.  Enterprise Case at Doc. #37 ¶ 105 and Doc. #39 ¶ 105.  Director Slaybaugh stated that it was his intention to "get out of" the Ready/Return Agreement in order to "'take back control' of the Airport garage, require the RACs to operate with far fewer spaces, require the RACs to pay additional per-space rent, create public parking on the 1st floor of the Garage, and generate more revenue for the City."  *Id*. ¶ 106.  Director Slaybaugh also believed that the RACs were not paying enough for the spaces, the RACs needed fewer spaces than they claimed, and that the Ready/Return Agreement was a bad deal for the City.  *Id.* ¶ 107.

12

On June 21, 2012, the City asked the RACs to complete a questionnaire that would allow the City to draft an upcoming "Request for Proposals," the usual precursor to the City's lease agreements with the RACs. Enterprise Case at Doc. #37 ¶ 74 and Doc. #39 ¶ 74. The questionnaire asked how many Ready/Return spaces each of the RACs would require over the next five years. *Id.* The Enterprise Plaintiffs informed the City that they already needed more spaces than they were allotted, and anticipated needing nearly a hundred more spaces over the next five years. *Id.*

On November 9, 2012, Director Slaybaugh provided the RACs with a memorandum regarding the City's "2013 On-Airport Rental Car Permit Process." Enterprise Case at Doc. #37 ¶ 77; Doc. #39 ¶ 77; and Doc. #37-8. The memorandum stated that the Concession Agreements were to "expire on December 31, 2012[,] and accordingly[,] the Rental Car Ready/Return Agreements automatically terminate." Doc. #37-8 at 1. The memorandum also stated that the City was "moving in the direction of permits" for the RACs, and that the City Commission would be meeting to vote on several ordinances to establish the process. Specifically, the ordinances would "establish Rules and Regulations," the "2013 On-Airport Rental Car Operator Permit Fees and Charges," and the "2013 Model Permit" for the RACs' operations at the Airport. *Id.* A draft copy of the permit and the rules and regulations were attached to the memorandum. *Id.* at 5-23.

13

Three weeks later, on November 28, 2012, the City Commission passed the ordinances as an "Emergency Resolution." Enterprise Case at Doc. #37-9 and Doc. #37-10 at 22-23. Representatives of the RACs, including Mike Filomena, Enterprise's Vice President and General Manager, spoke against the permit process before the Commission voted to pass the ordinances. Doc. #37-10 at 6-12.

The next day, November 29, 2012, Plaintiffs received permit forms by email from the City, and were given a deadline of December 5, 2012, to file "interest forms," and a deadline of December 14, 2012, to file finalized permits. Enterprise Case at Doc. #37 ¶ 84; Doc. #39 ¶ 84. The City also informed Plaintiffs that a lottery to distribute counter space and the Ready/Return locations would be held at 1:30 p.m. on December 17, 2012. *Id.* ¶ 85.

### F. Procedural Background

On November 28, 2012, the Avis Plaintiffs filed suit against the City, alleging that the City had repudiated their current lease agreements with the City, the Ready/Return Agreements, by declaring their imminent expiration and instituting the permit process. Avis Case at Doc. #1. They sought preliminary and permanent injunctive relief to enforce their rights under the Ready/Return Agreements, as well as a declaratory judgment specifying the parties' legal rights and obligations. *Id.* at 9-12. On December 3, 2012, the Enterprise Plaintiffs also filed suit against the City for breach of contract, making the same allegations and seeking similar relief. Enterprise Case at Doc. #1. The same day, the Avis and the

14

Enterprise Plaintiffs each filed a Motion for a Temporary Restraining Order. Avis Case at Doc. #3; Enterprise Case at Doc. #5.

During a phone conference held on December 5, 2012, the City agreed to stay the permit process and maintain the status quo of its existing lease agreements with Plaintiffs, pending a resolution of Plaintiffs' anticipated motion for a preliminary injunction seeking the same relief. *See* Avis Case, Notation Entry after Doc. #6. The Plaintiffs found the City's course of action acceptable. The parties later agreed to consolidate the Plaintiffs' motion for a preliminary injunction with trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2), thus, in effect, continuing the stay and status quo until resolution of the merits of the controversy. *See* Entry, Avis Case and Enterprise Case at Doc. #33.

The Avis Plaintiffs filed a Motion for Summary Judgment on June 4, 2013. Avis Case at Doc. #37. On June 18, 2013, the Enterprise Plaintiffs filed a Motion for Partial Summary Judgment on Count One of the Amended Complaint. Enterprise Case at Doc. 38. Plaintiffs all argue that they are entitled to judgment as a matter of law on their breach of contract claims. Doc. #38. Plaintiffs have also amended their complaints to include claims for attorneys' fees, alleging bad faith conduct by the City.[10] Avis Case at Doc. #65; Enterprise Case at Doc. #37. The City filed a Cross-Motion for Summary Judgment on All of Plaintiffs' Claims on

---

[10] In their Motions for Summary Judgment, Plaintiffs do not address their "bad faith" claims for attorneys' fees, which the Avis Plaintiffs assert would be more appropriate for resolution with a "limited, streamlined trial" after a ruling on the Motions for Summary Judgment. Avis Case, Doc. #56 at 2.

June 28, 2013.[11]  Avis Case at Doc. #58; Enterprise Case at Doc. #40.  The same

day, the City filed a Memorandum in Opposition to the Avis Plaintiffs' Motion for

Summary Judgment.  Avis Case at Doc. #60.  On July 9, 2013, the City filed a

Memorandum in Opposition to the Enterprise Plaintiffs' Partial Motion for Summary

Judgment.  Enterprise Case at Doc. #48.  On July 15, 2013, the Avis Plaintiffs

filed a Reply to the City's Memorandum in Opposition to their Motion for Summary

Judgment.  Avis Case at Doc. #66.  On July 23, 2013, both the Avis and

Enterprise Plaintiffs filed Responses to the City's Cross-Motion for Summary

Judgment.  Avis Case at Doc. #72; Enterprise Case at Doc. #67.[12]

Several other motions were filed that are relevant to the currently pending

summary judgment motions.  First, the City filed Motions for Oral Argument on its

Cross-Motions for Summary Judgment (Avis Case, Doc. #59 & Enterprise Case,

Doc. #41).  The Court sustained the City's Motion in the Avis Case on July 1,

---

[11] In spite of its title, the City's Cross-Motions for Summary Judgment on All of
Plaintiffs' Claims do not address Plaintiffs' claims for attorney fees as a result of
alleged bad faith.

[12] The Court recognizes that of the cross-motions pending before it, only the Avis
Plaintiffs' Motion for Summary Judgment has been fully briefed.  The Enterprise
Plaintiffs have not filed a Reply brief to the City's Memorandum in Opposition to
their Motion for Partial Summary Judgment.  In addition, the City has not filed a
Reply brief to Plaintiffs' Responses to the City's Cross-Motions for Summary
Judgment.  Normally, the Court would not rule on the pending motions without the
benefit of all the parties' replies.  However, the Court must deviate from its normal
practice due to the impending trial date, which will arrive before the conclusion of
the allowable briefing period.  It is noted, however, that all pending motions for
summary judgment have been responded to by the party against whom the motion
is filed, setting forth the party's position on the specific motion.  With the
exception of the Avis Plaintiffs, only the movants' replies remain outstanding.

2013. *See* Notation Order after Doc. #60. Upon reflection, the Court concludes that oral argument is unnecessary. Given that the lack of "complexity of the factual or legal issues presented" does not warrant oral argument, or make it "essential to the fair resolution of the case" before the Court, as required by Local Rule 7.1(b)(2), the Court VACATES its July 1, 2013, Order sustaining Defendant's Motion for Oral Argument in the Avis Case (Avis Case at Doc. #59) and OVERRULES Defendant's Motion for Oral Argument in the Enterprise Case (Enterprise Case, at Doc. #41).

Second, on July 2, 2013, the City filed a Motion in Limine to Exclude Parol Evidence. (Avis Case, Doc. #62 & Enterprise Case, Doc. #45). As explained below, the Court need not and does not resort to the examination of parol evidence to determine the parties' intent in its analysis of Plaintiffs' breach of contract/breach of lease agreement claims, finding their intent evident in the language of the Ready/Return Agreement in conjunction with the Concession Agreement. Furthermore, the Court does not construe the City's Motion in Limine as pertaining to Plaintiffs' bad faith claims. The motion, therefore, appears moot, and is OVERRULED WITHOUT PREJUDICE. The City may renew its motion at trial, if it believes that doing so will be relevant to its defenses to Plaintiffs' remaining claims for attorney fees, allegedly as a result of the City's bad faith.

## II.   STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure sets forth the standard and procedures for granting summary judgment.  Upon motion by either party, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant's burden is to demonstrate "the absence of a genuine issue of material fact as to at least one essential element on each of the Plaintiff's claims." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Conversely, material facts in genuine dispute that "may reasonably be resolved in favor of either party" require denial of summary judgment in order to be properly resolved by a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  When ruling on a motion for summary judgment, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*,

18

398 U.S. 144, 158-59 (1970)).  A court must avoid "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," which are "jury functions" that are inappropriate to employ at the summary judgment stage. *Id*.

When the parties agree to the facts relevant to the plaintiff's claim, but disagree as to the legal import of those facts, the parties may file cross-motions for summary judgment. *E.g.*, *Northrup Prop., Inc. v. Chesapeake Appalachia, LLC*, 567 F.3d 767 (6th Cir. 2009) (upholding summary judgment entered in favor of defendant after both parties filed cross-motions for summary judgment, as "[n]either party disputes the facts in this case").  Although the parties may agree that no genuine issues of material fact exist that would preclude the resolution of their claims and defenses as a matter of law, such a stipulation does not require a court "to rule that no fact issue exists." *Greer v. United States*, 207 F.3d 322, 326 (6th Cir. 2000) (quoting *Cherokee Ins. Co. v. E.W. Blanch Co.*, 66 F.3d 117, 123 n.4 (6th Cir. 1995)).  However, "cross motions for summary judgment do authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Greer*, 207 F.3d 322 (quoting *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir.1981)).

Thus, there is no obligation to "grant judgment as a matter of law for one side or the other," simply because the parties have filed simultaneous cross-motions for summary judgment based on their apparent agreement on the facts.

19

*Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 312 (6th Cir. 2010) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Instead, "a 'court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* (quoting *Taft*, 929 F.2d at 248). Each motion must be evaluated under the familiar standard that requires the court to "view all facts and inferences in the light most favorable to the non-moving party." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010) (quoting *Beck v. City of Cleveland, Ohio*, 390 F.3d 912, 917 (6th Cir. 2004)).

### III.   ANALYSIS

Each party's motion seeks an entry of summary judgment in its favor on the Plaintiffs' state law breach of contract/breach of lease agreement claims, which this Court may hear pursuant to its jurisdiction based on the diversity of the parties' citizenship. *See* 28 U.S.C. § 1332(a) (conferring jurisdiction on federal district courts to hear controversies between citizens of different states when amount in controversy exceeds $75,000). In a case brought pursuant to diversity jurisdiction, state substantive law provides the rule of decision. *See* 28 U.S.C. § 1652 (requiring application of state law as rules of decision in cases not applying federal law); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In such cases, the federal court must "apply state law in accordance with the controlling decisions of the state supreme court." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys.,*

20

*Inc.*, 249 F.3d 450, 453 (6th Cir. 2001).  If the state's highest court has not addressed the particular issue confronting the federal court, it is that court's task to "ascertain from all available data what the state law is and apply it." *Northland Ins. Co. v. Guardsman Products, Inc.*, 141 F.3d 612, 617 (6th Cir. 1998) (quoting *Clutter v. Johns-Manville Sales Corp.*, 646 F.2d 1151, 1153 (6th Cir.1981)). Thus, the federal court may also look to the decisions of the state appellate courts for guidance. *Id.* "If the state appellate court announces a principle and relies upon it, that is a datum not to be disregarded by the federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* The parties agree that Ohio law governs the Plaintiffs' breach of contract/breach of lease agreement claims, and the Ready/Return Agreement contains a choice-of-law provision that requires it to "be governed by and construed in accordance with" Ohio law.  Avis Case, Doc. #58-1 at 22.

Under Ohio law, the elements of a claim for breach of contract, such as a lease, "include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994).  Herein, the existence of the Ready/Return Agreement as a contract, Plaintiffs' respective performance according to its terms, and the loss that Plaintiffs would suffer by a substitution of its terms for those of the permit process do not motivate the parties' conflict.  Rather, the central issue to resolve is whether the City's implementation of the permit process breaches an existing lease term that should bind the City for another 17 and a half years, as

21

Plaintiffs allege, or if, as the City alleges, the term expired on December 31, 2012,

along with the expiration of the Concession Agreement, leaving the City free to

substitute its permit process for any negotiated successor to the expired lease

agreement.

To support their claims of breach, the Avis and Enterprise Plaintiffs make

many of the same arguments in their Motions for Summary Judgment, albeit with

slight variations. The Avis Plaintiffs argue that the clear and unambiguous terms of

the Ready/Return Agreement provide for a twenty-year lease term. Avis Case,

Doc. #37 at 24-25. Even if the language of the Ready/Return Agreement was

ambiguous, they argue, extrinsic evidence would show that the parties intended to

enter into a lease term of twenty years. *Id.* The Avis Plaintiffs also argue that the

City's interpretation, which asserts that the lease term expired with the

Concession Agreement on December 31, 2012, would render the twenty-year

lease term of the Ready/Return Agreement illusory, i.e., have the "absurd result" of

simply terminating two half years after commencing a twenty-year term. *Id.* at 25,

30. Believing the MOU and the Ready/Return Agreement to concern the "same

transaction," the Avis Plaintiffs urge the Court to read the documents together to

determine the parties' intent. *Id.* at 28. The Avis Plaintiffs argue that the City's

repudiation of the twenty-year lease term in favor of the permit process and its

refusal to negotiate a successor agreement constitute a breach of the

Ready/Return Agreement. *Id.* at 30-31.

22

The Enterprise Plaintiffs also argue that the Ready/Return Agreement plainly contains a twenty-year lease provision. They believe that the City has "wrongly conflate[d]" key terms in order to arrive at its interpretation of the December 31, 2012, expiration date, which would, as the Avis Plaintiffs also assert, "render meaningless several other provisions" of the Ready/Return Agreement. Enterprise Case, Doc. #38 at 13. Even if the City's interpretation were accepted, the Enterprise Plaintiffs argue, the permit would function as a "successor agreement" to the Concession Agreement, although implemented without good faith negotiation and therefore itself a breach of the City's duty to negotiate in good faith. *Id.* at 15-16. The Enterprise Plaintiffs also argue that the City breached the MOU's obligation to negotiate in good faith, which they believe binds the City because the MOU and the Ready/Return Agreement are only partially integrated. *Id.* at 37-38.

In Ohio, as elsewhere, courts construe written contracts as a matter of law. *Saunders v. Mortensen*, 801 N.E.2d 452, 454 (Ohio 2004). "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (citing *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989)). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411 (Ohio 1987) (paragraph 1 of the syllabus) (citing *Blosser v. Enderlin*, 148 N.E. 393 (Ohio

23

1925)). If the language is clear and unambiguous, the court "must simply give effect to the contractual language" in order "to determine the parties' rights and obligations;" however, if confronted with ambiguity, "an issue of fact exists," allowing the introduction and consideration of extrinsic or parol evidence to determine the parties' intent. *Blair v. McDonagh*, 894 N.E.2d 377, 388 (Ohio Ct. App. 2008); *see also Shifrin v. Forest City Enter.*, 597 N.E.2d 499, 501 (Ohio 1992).

A court must "presume that words are used for a specific purpose" and strive to "avoid interpretations that render portions meaningless or unnecessary." *Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008). "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Foster*, 678 N.E. at 526 (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978) (superseded by statute on other grounds)); *see also McConnell v. Hunt Sports Ent.*, 725 N.E.2d 1193, 1206 (Ohio Ct. App. 1999) (describing the foregoing principle as a "test for determining whether a term is ambiguous"). A court must read a contract "as a whole," and, in the process, "give effect to each provision of the contract." *Saunders*, 801 N.E.2d at 455 (citations omitted). "Only when the language of a contract is unclear or ambiguous . . . will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Shifrin*, 597 N.E.2d at 501.

24

The controversy between the parties centers around the two sentences in the "Term" provision of the Ready/Return Agreement that describe its duration, which state the following:  **This Agreement shall expire twenty (20) years from the Garage Completion Date, unless earlier terminated as set forth in Article XI or Article XII.  In addition, this Agreement shall automatically terminate upon the date of termination of the Concession Agreement."**  Taking each clause of each sentence in turn, it is first apparent that the parties intended for the terms of the Ready/Return Agreement to be in force for a period of twenty years, commencing with the completion of the construction of the new Airport garage.  The second clause of the first quoted sentence references Article XI, "Termination by City," and Article XII, "Termination by Operator."  The two provisions recognize certain "Events of Default" that, upon occurrence, give a party the right to terminate the agreement before the end of the twenty-year period.  The "Events of Default" that would allow the City to terminate the agreement are typical examples of non-performance or breach (such as a RAC's failure to perform under the Ready/Return Agreement or abandonment of its airport operations), or situations that present a serious risk of non-performance or breach (such as a lack of insurance or insolvency).  In turn, the RACs could terminate the agreement if their performance became impossible because of the issuance of an injunction or an action by a government entity other than the City.  These provisions are unremarkable, because "[l]eases may and frequently do, contain provisions giving an election, option, right, or privilege to the parties or one of them to terminate the lease either

25

at will or on the happening of some contingency." *Fox v. Churngold Corp.*, 136 N.E.2d 754, 757 (Ohio Ct. App. 1956).  The phrase "unless earlier terminated as set forth in Article XI or Article XII" simply defines the exception to the twenty-year term set forth in the first clause of the sentence.

The second sentence, which states that "[i]n addition, this Agreement shall automatically terminate upon the date of termination of the Concession Agreement," continues to define the possible exceptions to the twenty-year lease term.  To do so, this sentence incorporates by reference the conditions of termination contained in the Concession Agreement into the Ready/Return Agreement.  "Where one instrument incorporates another by reference, both must be read together.  Courts should attempt to harmonize provisions and words so that every word is given effect." *Christe v. GMS Mgmt. Co.*, 705 N.E.2d 691, 693 (Ohio Ct. App. 1997).  For example, in *Blanchard Valley Farmers Coop., Inc. v. Carl Niese & Sons Farms, Inc.*, 758 N.E.2d 1238, 1244 (Ohio Ct. App. 2001), language in an agreement stating that "this purchase is made subject to the trade rules of the National Grain and Feed Association" led the Ohio Court of Appeals to consult and incorporate the specific, "relevant provision" of the trade rules into the agreement it was construing.  Citing *Christe*, the court stated that "[d]ocuments that are incorporated by reference into a contract are to be read as though they are restated in the contract." *Id.*

The same form of incorporation occurs here when the Ready/Return Agreement depends upon the termination provisions of the Concession Agreement

26

to define some of the exceptions to the twenty-year term. As in *Blanchard Valley*, it is only a specific provision that is incorporated, not the entirety of the referenced document. *Id.*; *see also Krause v. Oscar Daniels Co.*, 22 N.E.2d 544 (Ohio Ct. App. 1939) (describing specific terms referred to on external document that "became part of the contract solely for the purpose mentioned"). Thus, Article XIII and Article XIV, the termination provisions of the Concession Agreement, "are to be read as if they are restated in" the Ready/Return Agreement. Doc. #40-6 at 24-26; Doc. #58-1 at 16-18; *Blanchard Valley*, 758 N.E.2d at 1244. By stating that the term of the Ready/Return Agreement will "automatically terminate upon the date of termination of the Concession Agreement," the parties intended that a party's termination of the Concession Agreement based on one of its "Events of Default" would have the same effect, termination, on the Ready/Return Agreement. In addition, the termination would be automatic and occur on the same date that a party terminated the Concession Agreement. In accordance with *Christe*, this construction harmonizes the provisions of the two agreements and gives each of their words effect. *Christe*, 705 N.E.2d at 693.

Furthermore, with the exception of a provision that allows the City to terminate if the RACs fail to collect Customer Facility Charge ("CFC") revenue, the relevant articles of the Concession Agreement that describe the "Events of Default" allowing termination are identical to those contained in the Ready/Return Agreement. Their incorporation into the Ready/Return Agreement is perfectly logical, because the Ready/Return Agreement contemplates a lease term that had

not yet begun, due to the future "Garage Completion Date" that was to commence the twenty-year term. The incorporation of the Concession Agreement's termination conditions allowed the City to preserve its right to terminate for a failure to collect the CFC revenue, until such point in time as the Concession Agreement expired and the RACs occupied the new garage pursuant to the Ready/Return Agreement. The sentence in question merely recognizes that the "Events of Default" in the Concession Agreement would have the same effect on the Ready/Return Agreement, and "automatically terminate" it. However, if the Concession Agreement were improperly terminated by a party, the Ready/Return Agreement would not "automatically terminate." Likewise, the expiration of the agreed-upon term of the Concession Agreement (December 31, 2012) was not an "Event of Default," and cannot, therefore, have "automatically terminated the Ready/Return Agreement, or formed a proper basis for the City' to terminate said Ready/Return Agreement.

The foregoing observations are supported by an examination of the dates on which the agreements were signed. The Concession Agreement was initially in effect from January 1, 2007, until December 31, 2009. Doc. 3-3 at 5. The Ready/Return Agreement was signed on March 4, 2009, during the initial term of the Concession Agreement, but only ten months before its expiration. Incorporating by reference the conditions for termination that were currently in effect provided continuity between the agreements when the condition precedent to the commencement of the lease term (the "Garage Completion Date") had not

28

yet occurred. Because the Concession Agreement allowed extensions of its term in one-year increments, it is reasonable to infer that the parties contemplated extending it until the commencement of the twenty-year lease term in the Ready/Return Agreement on the Garage Completion Date. *Id.* at 6. Furthermore, this is precisely what occurred when the parties executed the Second Amendment to the Concession Agreement, and extended its term until the new "Expiration Date" of December 31, 2012. Doc. #3-3 at 29.

The City's counter-argument hinges on its contention that "[t]he Terms 'Expiration' and 'Termination' are synonymous," a faulty premise that is necessary to accept for it to conclude that "the Concession Agreement terminated by expiration on December 31, 2012, while the Ready/Return Agreement automatically terminated on December 31, 2012." Avis Case, Doc. #60 at 14. The Court must, however, presume that the words "expiration" and "termination" are each used for a specific purpose within the Ready/Return Agreement. *Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008). Article V, when defining the "Term," of the Ready/Return Agreement, states that it "shall expire twenty (20) years from the Garage Completion Date, unless earlier terminated" by a party. Doc. #58-1 at 7 (emphasis added). Each term carries a distinct meaning in the sentence. No party must act for the agreement to expire, but a party must act to terminate it. In this sentence, the agreement does not equate the terms by stating that it "terminates or expires" twenty years after the Garage Completion Date.

29

Furthermore, the "ordinary meaning" of the "common words" in question also demonstrates the distinction. *Foster*, 678 N.E. at 526. The verbs "expire" and "terminate" both have an intransitive form, which does not take a direct object.[13] *See* Webster's Third New Int'l Dictionary at 801 (defining "expire") and 2359 (defining "terminate"). Only "terminate" also has a transitive form in its ordinary meaning, which allows a direct object. [14] An agreement expires, an agreement terminates, or a party terminates an agreement; but a party does not expire an agreement. It is true that in its intransitive forms, one of the ordinary meanings of "terminate" is synonymous with "expire." *Id.* at 2359 (providing a definition of intransitive form of "terminate" as "to come to an end in time"). Otherwise, the City's argument would not even be coherent. However, the only example of the intransitive form of "terminate" in the provision specifically states that the "Agreement shall *automatically* terminate upon the date of termination of the Concession Agreement." (emphasis added.) This use of the adverb "automatically" emphasizes the intransitive form of "terminate," while also highlighting the fact that the parties chose not to use the synonymous intransitive verb "expire." In other words, the choice of language suggests that the parties

---

[13] A transitive verb employs a direct object, thereby "[e]xpressing an action that carries over from an agent or subject to an object." Webster's Third New Int'l Dictionary (1976) at 2428. Conversely, an intransitive verb "express[es] an action or state as limited to the agent or subject or as ending in itself," with no reference to a direct object. *Id*. at 1186 (providing as examples "the verbs in 'the bird flies' and 'he runs'").

[14] The transitive form of "expire" is considered obsolete, and, therefore, no longer carries an "ordinary meaning." Webster's Third New Int'l Dictionary at 801.

specifically chose not to conflate the terms, and that they intended at all times to distinguish termination by a party to the agreement from expiration according to its negotiated term. Thus, when the Ready/Return Agreement states that it may "automatically terminate" before the expiration of its term, such language does reference a party's *act* of termination---- a party's decision to terminate the Concession Agreement, which also has the effect of terminating the Ready/Return Agreement. The specific reference is not to the expiration of either agreement, and the Court must presume that the words were used for a specific purpose. *Wohl*, 888 at N.E.2d at 1066. This distinction is also reflected in the language of the Second Amendment to the Concession Agreement, which states that it "is effective for a period of six (6) years . . . and expiring December 31, 2012 ("Expiration Date), unless terminated earlier in accordance with the provisions of this Agreement." Doc. #3-3 at 39.

For the same reasons, the Court must reject the City's assertion that the twenty-year lease term described in the Ready/Return Agreement is only a "possibility." Avis Case, Doc. #60 at 19. The City characterizes the lease term as a "possible 20-year period" with "several possible termination circumstances, including automatic termination on the date of the termination of the Concession Agreements, i.e. December 31, 2012." *Id.* Such an interpretation is premised upon a complete equivalence of the terms "expire" and "terminate," because that is the only possible way that the *expiration* of the Concession Agreement could be cloaked as a "termination" and imported into the Ready/Return Agreement. The

31

twenty-year term of the Ready/Return Agreement is expressed in mandatory language, stating that the Agreement "shall expire (20) years from the Garage Completion Date ...." The City's interpretation would "render . . . meaningless" a twenty-year term expressed in mandatory language, reducing it to only a "possibility." *Wohl*, 888 at N.E.2d at 1066.

The Court notes that it reaches its conclusions regarding the existence of the twenty-year lease term defined by the Ready/Return Agreement without reference to the Memorandum of Understanding ("MOU"). Plaintiffs urge the Court to read the MOU and the Ready/Return Agreement together to discern the parties intent. The City argues that the MOU is not an enforceable agreement, and is parol evidence that should not be considered to determine the parties' intent. The Court interpreted the Ready/Return Agreement by examining both its language and the incorporated provisions of the Concession Agreement, and did not conclude that the language of the Ready/Return Agreement was either ambiguous or unclear. Only a contrary conclusion would have justified an examination of the MOU. As noted previously, "[o]nly when the language of a contract is unclear or ambiguous . . . will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Shifrin v. Forest City Enter.*, 597 N.E.2d 499, 501 (Ohio 1992). Therefore, it is unnecessary to consult the MOU to determine the parties' intent, or to address the issue of whether the MOU is parol evidence or a writing to be read together with the Ready/Return Agreement.

32

A contract dispute that centers over the duration of an agreement may present a question of fact that is unresolvable by summary judgment. *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 474 N.E.2d 271 (Ohio 1984). For example, in *Inland Refuse*, the Ohio Supreme Court reversed the trial court's grant of summary judgment in a contract action that centered on competing interpretations of the duration of a landfill agreement where "the Agreement fail[ed] to expressly state the duration[,] whether that may be for a specific term, or until the occurrence of a particular event, such as the payment of the Note or the filling of the Landfill." *Id.* at 322. The Supreme Court rejected one party's argument that the duration could be "clearly and unambiguously supplied by implication from [other] express terms" contained in the agreement. *Id.* at 323. Summary judgment was inappropriate where the agreement lacked "any provision whose sole possible interpretation clearly and unambiguously supports only one party's position as to duration." *Id.* at 324.

This case is clearly distinguishable from *Inland Refuse.* Here, the Ready/Return Agreement expressly states a twenty-year duration, subject to certain conditions for termination. A shorter duration cannot be supplied by implying that the expiration of the Concession Agreement functions as a termination of the Ready/Return Agreement, when the terms are clearly and unambiguously used for distinct purposes in both agreements. Thus, the Court's construction aligns with the Plaintiffs' view that the Ready/Return Agreement defined a lease term of twenty years, and that the December 31, 2012, expiration

33

date of the Concession Agreement did not terminate the Ready/Return Agreement. Contrary to the City's assertions, the December 31, 2012, expiration date of the Concession Agreement had no effect on the twenty-year lease term of the Ready/Return Agreement, other than to provide the City with a manufactured justification for implementing the permit process.  The Court concludes that the City's disregard of its obligations under the twenty-year term of the Ready/Return Agreement, and its implementation of a permit process to replace its governing terms, constituted a breach of the Ready/Return Agreement by which it was bound.  The Court, therefore, will SUSTAIN Plaintiffs' motions as to their breach of contract against Defendant.

IV.    **CONCLUSION**

       For the reasons set forth above, the Court will SUSTAIN the Avis Plaintiffs' Motion for Summary Judgment (Avis Case, Doc. #37) and the Enterprise Plaintiffs' Motion for Partial Summary Judgment on Count One of its Amended Complaint (Enterprise Case, Doc. #38), and OVERRULE the City's Cross-Motions for Summary Judgment on All of Plaintiffs' Claims (Avis Case, Doc. #58; Enterprise Case, Doc. #40).  The Court does not decide Plaintiffs' claims for attorneys' fees premised on Defendant's bad faith in the present decision, as these claims were not presented or addressed in their summary judgment motions, and remain to be adjudicated.

Furthermore, the Court VACATES its July 1, 2013, Order sustaining Defendant's Motion for Oral Argument in the Avis Case (Avis Case at Doc. #59) and OVERRULES Defendant's Motion for Oral Argument in the Enterprise Case (Enterprise Case, at Doc. #41), given that "the complexity of the factual or legal issues presented" in the parties' motions does not warrant oral argument, nor would oral argument be "essential to the fair resolution of the case" before the Court, as required by Local Rule 7.1(b)(2).

Finally, the Court OVERRULES, without prejudice, the City's Motion in Limine to Exclude Parol Evidence (Avis Case, Doc. #62 & Enterprise Case, Doc. #45). Parol evidence was not required to determine the parties' intent when deciding Plaintiffs' breach of contract/breach of lease agreement claims. The City may renew its Motion in Limine at trial, if the City believes that the issue of parol evidence is relevant the defenses it will mount to Plaintiffs' remaining claims for attorneys' fees.

Date: July 24, 2013

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

35